UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JENNIFER E. H.,[1]

        **Plaintiff,**

    v.                                    **Civil Action 3:25-cv-210**
                                              **Judge Thomas M. Rose**
                                            **Magistrate Judge Chelsey M. Vascura**

**COMMISSIONER OF SOCIAL
SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Jennifer E. H. ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for a period of disability and disability insurance benefits ("DIB"). This matter is before the Court for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 8), the Commissioner's Memorandum in Opposition (ECF No. 12), Plaintiff's Reply (ECF No. 13), and the administrative record (ECF No. 7). For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

## I.    BACKGROUND

Plaintiff protectively filed her DIB application in October 2022, and initially alleged that she became disabled February 17, 2023. After Plaintiff's application was denied at the initial and reconsideration levels, an administrative law judge ("ALJ") held a telephonic hearing on March

---

[1] Pursuant to this Court's General Order 22-01, any opinion, order, judgment, or other disposition in Social Security cases shall refer to plaintiffs by their first names and last initials.

20, 2024. Plaintiff, who was represented by counsel, and a vocational expert ("VE") both appeared and testified at that hearing. During the hearing, Plaintiff amended her alleged disability onset date to March 7, 2022. On May 16, 2024, the ALJ issued an unfavorable determination which became final on April 23, 2025, when the Appeals Council denied Plaintiff's request for review.

Plaintiff seeks judicial review of that final determination. She contends that the ALJ reversibly erred when assessing her subjective symptoms (*f.k.a.*, making a credibility determination) and when relying on the VE's testimony to find that there was a significant number of jobs in the economy that she could perform. (Pl.'s Statement of Errors 5–10, ECF No. 8.) Defendant correctly contends that Plaintiff's contentions of error lacks merit. (Def.'s Mem. in Opp'n, 3–7, ECF No. 12.)

## II.     THE ALJ'S DECISION

On May 16, 2024, the ALJ issued the decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 14–34.) The ALJ initially determined that Plaintiff met the insured status requirements of the Social Security Act through December 31,

2024. (*Id*. at 19.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since her alleged disability onset date of March 7, 2022. (*Id*.) At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease; chondromalacia of the bilateral knees; lung disease; obesity; seizure disorder; varicose veins; bipolar disorder; anxiety disorder; and post-traumatic stress disorder (PTSD). (*Id.*)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*. at 20.) Before proceeding to step four, the ALJ set forth Plaintiff's residual functional capacity ("RFC")[3] as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b), except that she can stand and walk for four hours total in an

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

[3] A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations" "on a regular and continuing basis." 20 C.F.R. § 416.945(a)(1), (b)–(c).

3

eight-hour workday. She can frequently balance (as defined by the Specific Characteristics of Operations (SCO)). She can occasionally climb ramps and stairs, kneel, stoop, crouch, and crawl, but can never climb ladders, ropes, or scaffolds. She must avoid concentrated exposure to extreme cold, extreme heat, and wetness, and avoid all exposure to atmospheric conditions (as defined by the SCO), unprotected heights, and dangerous/heavy machinery. She is able to understand, remember, and carry out simple instructions and perform routine tasks. She can use judgment to make simple work-related decisions and can perform goal-oriented work (e.g. office cleaner) but is unable to perform at a production rate pace (e.g. assembly line work or other jobs that require strict time pressures or strict production demands). She is limited to occasional superficial contact with coworkers and supervisors, with "superficial contact" defined as retaining the ability to receive simple instructions, ask simple questions, and receive performance appraisals, but as lacking the ability to engage in more complex social interactions such as persuading other people or rendering advice. She is limited to no contact with the public as part of job duties. She is limited to occasional changes in an otherwise routine work setting explained gradually and in advance to allow time for adjustment to new expectations.

(*Id*. at 23.)

At step four, the ALJ relied on testimony from the VE to determine that Plaintiff would not be able to perform her past relevant work. (*Id*. at 28.) Relying on the VE's testimony again at step five, the ALJ determined that given her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform including the representative occupations of routing clerk, merchandise marker, and office helper. (*Id*. at 28–29.) Accordingly, the ALJ determined that Plaintiff was not disabled as defined in the Social Security Act during the relevant time frame. (*Id*. at 29.)

### III.     STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm a decision by the Commissioner as long as it is supported by substantial evidence and was made pursuant to proper legal standards." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) (cleaned up); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Although this

standard "requires more than a mere scintilla of evidence, substantial evidence means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 561 (6th Cir. 2022) (cleaned up) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)).

Even though the substantial evidence standard is deferential, it is not trivial. The Court must "examine[ ] the record as a whole and take[ ] into account whatever in the record fairly detracts from the weight" of the Commissioner's decision. *Golden Living Ctr.-Frankfort v. Sec'y Of Health And Hum. Servs.*, 656 F.3d 421, 425 (6th Cir. 2011) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, where "substantial evidence supports the Secretary's determination, it is conclusive, even if substantial evidence also supports the opposite conclusion." *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020) (quoting *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## IV.    ANALYSIS

As explained, Plaintiff contends that the ALJ reversibly erred when performing a subjective symptom assessment and by relying on the VE's testimony at step five. The undersigned addresses each contention in turn and finds that they both lack merit.

### A.    The ALJ's Subjective Symptom Assessment

Plaintiff first challenges the ALJ's subjective symptom assessment. (Pl.'s Statement of Errors 5–9, ECF No. 8.) That challenge is not well taken.

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating those symptoms. *See* 20 C.F.R. §§ 404.1529, 416.929(c)(1); *Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims*, SSR 16–3p, 2017 WL 5180304, at*10 (Oct. 25, 2017). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must . . . evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must consider all available evidence from medical and nonmedical sources, including medical opinions. *Id.* In addition, SSR 16–3p[4] sets forth factors that an ALJ will consider: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, an individual receives or has received

---

[4] SSR 96-7p, 1996 WL 374186 (July 2, 1996) which has been superseded by SSR 16-3p, required an ALJ to evaluate the overall credibility of a plaintiff's statements. In contrast, SSR 16-3p requires an ALJ to evaluate the *consistency* of a plaintiff's statements, without reaching the question of overall *credibility*, or character for truthfulness. 2017 WL 5180304, at * 11 ("In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person."). The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word credibility . . . to clarify that the subjective symptoms evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.,* 656 F. App'x 113, 119 n.1 (6th Cir. 2016). Therefore, the credibility determination and subjective symptom analysis are not materially different, and case law regarding the former applies with equal force to the latter.

6

for relief of pain or other symptoms; 6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and 8) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. 2017 WL 5180304 at *7–8; *see also* 20 C.F.R. § 404.1529(c)(3)(i)–(vii). Although an ALJ is not required to analyze all these factors, the ALJ should show that he or she considered the relevant evidence. *Roach v. Comm'r of Soc. Sec.*, No. 1:20-CV-01853-JDG, 2021 WL 4553128, at *10–11 (N.D. Ohio Oct. 5, 2021).

An ALJ will also consider whether a plaintiff sought medical treatment and followed prescribed care. SSR 16-3p, 2017 WL 5180304, at *9. Attempts to obtain or follow prescribed treatment may show that symptoms are intense and persistent; conversely, a lack of such efforts may show that an individual's symptoms are not intense or persistent. *Id.* at *9–10. But an ALJ may draw an adverse inference from a plaintiff's failure to seek or follow treatment only if he or she both considers and explains the plaintiff's possible reasons for that failure. *Id.* at *10; *Dooley,* 656 F. App'x at 119 (noting that an ALJ must consider the claimant's reasons before inferring that a lack of treatment undermines the claim).

An ALJ need only discuss those factors that are pertinent based upon the evidence in the record. SSR 16–3p, 2017 WL 5180304 at *7–8. However, the ALJ's discussion of the applicable factors "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10; *cf. Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so.").

Here, the undersigned finds no reversible error in the ALJ's subjective symptom assessment. The ALJ began by setting forth the two-part process described above. (R. at 23.) The ALJ then summarized Plaintiff's subjective symptoms, writing as follows.

> The claimant alleged that her severe impairments prevented her from being able to work. She testified in detail about her symptoms and limitations at her hearing. The claimant alleged that her back and knees experienced chronic pain and did not allow her to do what she used to do. She alleged that she experienced pain so severe that she could not stand for more than 30 minutes at a time without her knees buckling and her back giving out. She stated that she tried physical therapy, but alleged that it made her pain worse. She stated that she tried injections in her back and knees, along with radiofrequency ablations, which all did not provide lasting relief. She alleged that her back and knee pain caused pain while sitting down, and that she could only sit for about one hour at a time. She stated that she had issues with seizures, but noted that she had not experienced any since starting Keppra. In regards to her lung disease, she noted that she used two different inhalers and for her respiratory issues that provided relief and improvement in her breathing, though she stated that she still had some symptoms. She stated that her varicose veins caused pain in her legs, but stated that since she underwent a procedure where they "burned a vein," she has had no repeating issues. She alleged that she had issues with nausea and vomiting every day and that nothing would improve her symptoms. The claimant alleged that she had not been able to be around people because it was "mentally way too much for me." She stated that her mental impairments made her feel more mentally overwhelmed than before. She alleged that she no longer went out in public unless she had to and had not been to church in a few years. She stated that she would have her groceries delivered. She stated that she relied on her mother to drive her because if she tried to drive she would "freak out a little bit." She alleged that she experienced panic attacks that would cause chest tightness, and alleged that she had problems with her anger and temper where she would be calm one moment and then be mad and yelling the next. She stated that those episodes occurred about 4-5 times per month.

(*Id*. at 23–24.) The ALJ then concluded that Plaintiff's allegations were not entirely consistent with the record evidence. (*Id*. at 24.) The ALJ wrote as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the symptoms of the types alleged; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(*Id*.)

8

The ALJ then discussed the record evidence and drew several conclusions. The ALJ first discussed the results of imaging studies, physical examinations, and an EMG before determining that that "diagnostic imaging showing normal to no more than moderate findings, good response to conservative treatment, and mostly unremarkable physical examination findings suggest the claimant's back and knee conditions are not as limiting as alleged." (*Id*. at 24–25.) The ALJ next discussed Plaintiff's radiofrequency ablation, a CT scan of Plaintiff's chest, a spirometry test, and physical examination findings and determined that although Plaintiff "received treatment for lung disease, and varicose veins . . . the record indicated that she had a greater physical functioning than alleged." (*Id*. at 25.) The ALJ then discussed the results of an EEG, a physical examination, and the effectiveness of Plaintiff's seizure medication, Keppra, and determined that Plaintiff's "treatment history indicated that her seizure disorder did not cause a level of limitation consistent with her allegations." (*Id*. a 25.) Finally, the ALJ discussed Plaintiff's consultative psychological examinations, her psychological treatment history, and her normal mental status examinations during appointments with providers before determining that the evidence "suggest[ed] that [her] mental health is not as limiting as alleged . . . ." (*Id*. at 25–26.)

The ALJ then reiterated that he had considered Plaintiff's symptoms and determined that they were not as limiting as alleged. The ALJ wrote as follows:

> Social Security Regulation 16-3p requires an evaluation of the intensity and persistence of the symptoms alleged by the claimant in order to determine how the symptoms limit the claimant's ability to perform work-related activities. To perform this evaluation, the claimant's allegation of functional limitations is compared to the evidence in the case record, including the extent to which testimony is contradicted or corroborated by other evidence and any other circumstances that tend to shed light upon the limiting effects of the claimant's symptoms. When evidentiary inconsistencies exist, reliance on the claimant's testimony as a basis for decision-making is undermined. After a review of the entire record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. *However, as discussed above, the claimant's statements concerning the intensity,*

9

*persistence and limiting effects of these symptoms are found to be inconsistent with the objective evidence in the case record.* Additionally, inconsistencies with other evidence, as discussed below, render the claimant's allegations less persuasive.

The claimant alleged at her hearing that she had significant physical and mental limitations. However, she later testified that treatments for her varicose veins, lung disease, and seizure disorder were successful in controlling her symptoms. She also alleged that she was limited in completing her activities of daily living due to physical limitations, but was later noted in 2023 as hurting her back after falling while doing yardwork, which suggests that she was capable of doing yardwork as long as she did not fall. *These inconsistencies combined with her receipt of no more than conservative care, diagnostic imaging, and objective physical and mental status examination findings rendered the claimant's allegations less persuasive,* and as such the undersigned found the claimant limited to the level in the residual functional capacity statement above, but did not find her as limited as alleged.

(*Id*. at 26–27) (emphasis added).

As this detailed multi-part discussion demonstrates, the ALJ determined that Plaintiff's statements about the disabling nature of her symptoms were unpersuasive for several reasons including that they were inconsistent with objective evidence such as diagnostic imaging and physical and mental status examinations. (*Id*.) That was a proper consideration. *Showalter v. Kijakazi*, No. 22-5718, 2023 WL 2523304, at *3 (6th Cir. Mar. 15, 2023) (explaining that "[a]n ALJ must consider how closely a claimant's self-reported symptoms line up with objective medical evidence and other evidence in the record.") *See also*, SSR 16-3p, 2017 WL 5180304, at *5 (explaining that "objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities").

The ALS's determination that Plaintiff's disabling allegations were inconsistent with that objective evidence was also substantially supported by the record. First, as the ALJ discussed earlier in the determination, the record contained relatively moderate diagnostic imaging results. (*Id*. at 24.) A June 2019 X-ray of Plaintiff's knees was normal, and a December 2022 MRI of

Plaintiff's knees showed only mild chondromalacia. (*Id*. at 24, 395, 399, 1569–70.) A 2022 a MRI of Plaintiff's lumbar spine also showed only mild disc disease at L3-L4 and mild thecal sac flattening at L4-L5, but no severe stenosis at any level. (*Id*. at 24, 1574.) And a 2023 X-ray of Plaintiff's lumbar spine showed normal lumbar alignment and no acute osseus abnormality. (*Id*. at 2494.)

Second, and as the ALJ also discussed, the record reflected relatively unremarkable physical examination findings related to Plaintiff's back and knee conditions both before and during the relevant period. (*Id*. at 24–25.) Examiners routinely found that Plaintiff's back had no tenderness, or no CVA tenderness. (*Id*. at 275, 284, 303, 347, 363, 371, 384, 390, 398, 410, 442, 452, 478, 491, 506, 510, 515, 541, 547, 552, 555, 560.) Examiners also routinely found that Plaintiff had good, normal, or full ranges of motion in her extremities or in her hips, knees, and ankles, or that she could move all her extremities or had no motor deficits. (*Id*. at 284, 303, 1211, 1219, 1258, 1669, 2509.) Upon examination, Plaintiff regularly had full strength in all her extremities; or in her hips, legs, and ankles; or she had normal muscle tone. (*Id*. at 307, 314, 1219, 1258, 1526, 1531, 1560, 1561, 2509.) Plaintiff's gait was described as normal, smooth, steady, or satisfactory and it was noted on at least one occasion that she did not have ataxia. (*Id*. at 1215, 1402, 1526, 1531, 1560, 2517.) Results from more recent musculoskeletal examinations in 2023 and 2024 also reflected that Plaintiff's ranges of motion were normal. (*Id*. at 2537, 2541.)

Third, as the ALJ also discussed, despite an abnormal 2023 EEG, physical examinations routinely noted normal neurological findings both before and during the relevant period. (*Id*. at 25.) For example, examiners routinely found that Plaintiff had normal sensation or no sensory deficits (*id*. at 284, 1211, 1219, 1526, 1531, 1560, 2517), normal reflexes (*id*. at 1526, 1531,

11

1560, 2517), and normal coordination (*id*. at 1402, 2537, 2541, 2566, 2572). Her cranial nerves were also routinely normal, intact, or without deficit. (*Id*. at 1560, 2517, 2537, 2541, 2566, 2572.) Plaintiff was frequently found to be alert and oriented. (*Id*. at 284, 1219, 1258, 1308, 1402, 2411, 2480, 2499, 2523, 2537, 2541, 2566, 2570, 2572.) She was often described as having no focal deficits. (*Id*. at 284, 1211, 1258, 1308, 1402, 2411, 2480.)

Finally, and as the ALJ discussed, Plaintiff's mental status examinations before and during the relevant period were routinely normal. (*Id*. at 26.) The record reflects that examiners found that Plaintiff had a normal mood (*id*. at 1263, 1402, 1526, 1531, 1560, 2411, 2570), normal thought content (*id*. at 403, 433, 1263, 1402, 2411, 2499, 2538, 2541, 2566, 2572), and normal behavior (*id*. at 403, 433, 1402, 2411, 2537, 2541, 2566, 2572). Examiners also found that Plaintiff had normal or good judgment. (*Id*. at 1263, 1402, 1526, 1531, 1560, 2411, 2537, 2541, 2566, 2572.)

In addition to determining that this objective evidence was inconsistent with Plaintiff's statements, the ALJ determined that other evidence was inconsistent with Plaintiff's statements. For instance, the ALJ noted that treatments effectively controlled several of her conditions, including her varicose veins, lung disease, and seizure disorder. (*Id*. at 26.) Treatment was a proper factor to consider under SSR 16-3p. 2017 WL 5180304 at *7–8. The ALJ's treatment determination was also supported by substantial evidence—Plaintiff testified that her "vein thing" was "okay" after treatment; changes to her daily inhaler reduced her use of an emergency inhaler; and she did not have ongoing issues with seizures since taking Keppra. (R. at 49, 48, 47.)

The ALJ also determined that Plaintiff's statements about the disabling nature of her symptoms were inconsistent with her activities. (*Id*. at 27.) Daily activity was a proper factor to consider under SSR 16-3p. 2017 WL 5180304 at *7. The ALJ's activity determination was also

12

supported by substantial evidence. In October 2023, Plaintiff injured her back while performing yardwork. (*Id*. at 27, 2560.) The ALJ reasoned that her ability to do yardwork suggested that she had more physical capabilities than she alleged. (*Id*. at 27.)

The ALJ also determined that Plaintiff's statements about the disabling nature of her symptoms were inconsistent with her conservative care. (*Id*.) Conservative care was a proper consideration under SSR 16-3p. 2017 WL 5180304 at *9. That conservative care determination was also supported by substantial evidence because Plaintiff's mental health was managed by her primary care physician. (*Id*. at 26.)

In short, the ALJ properly considered and determined that Plaintiff's disabling allegations were inconsistent with objective evidence; evidence of effective treatment (*i.e.*, ablation, inhalers, and Keppra); daily activities (*i.e.*, yardwork); and conservative mental health treatment. (R. at 24–27.) Plaintiff nevertheless contends that the ALJ erred by noting that she used Keppra to control her seizure symptoms but failing to also consider that medication's side effects. (Pl.'s Statement of Errors 7, ECF No. 8.)

Certainly, Plaintiff testified that Keppra made her extremely tired. (R. at 54.) But Plaintiff does not point to, and the undersigned has been unable to independently identify evidence that Plaintiff reported this side effect to her care providers. Accordingly, the ALJ did not reversibly err by failing to consider that side effect. *See Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 665 (6th Cir. 2004) (finding that the ALJ did not err by failing to consider medication side effects even though the plaintiff testified to the same; the record did not indicate that plaintiff ever reported side effects to her doctors); *Hopkins v. Comm'r of Soc. Sec.*, 96 F. App'x 393, 395 (6th Cir. 2004) (finding no error where an ALJ rejected a plaintiff's testimony regarding medication side effects that "were not documented in the record"). *See also Tricia G. v. Comm'r*

13

*of Soc. Sec.*, No. 1:22-CV-00412, 2023 WL 6170545, at *8 (S.D. Ohio Sept. 22, 2023) ("Because Plaintiff did not cite to any evidence that she complained to her providers about disabling side effects, the ALJ did not err by failing to find the claimed side effects to be disabling.").

Because the ALJ's determination was substantially supported by the record, the undersigned concludes that the ALJ did not reversibly err when assessing Plaintiff's subjective symptoms. Consequently, Plaintiff's first contention of error lacks merit.

**B.     The Time-Off-Task Limit**

Plaintiff next contends that the ALJ erred at step five when he relied on the VE's testimony to determine that a significant number of jobs existed in the economy that she could perform. (Pl.'s Statement of Errors 9–10, ECF No. 8.) This contention is also not well taken.

Plaintiff contends that the testimony that the VE relied on was elicited in response to a hypothetical question that inaccurately portrayed her limits because it did not include a time-off-task or absence limit. (*Id.*) In essence, she argues that the ALJ should have included such a limit in her RFC. (*Id.*) To support that contention, she cites her reports to treatment providers that her back pain caused her to miss work and experience sleep disturbances. (Pl.'s Statement of Errors 10, ECF No. 8 (citing R. at 1423, 1428).) But Plaintiff does not cite any objective medical evidence, including any medical opinions or administrative findings, demonstrating that additional restrictions for being off task or absent were warranted. *See Stephanie R. v. Comm'r of Soc. Sec.*, No. 3:23-CV-313, 2024 WL 1615154, at *5 (S.D. Ohio Apr. 15, 2024) (finding ALJ did not err by failing to include in a plaintiff's RFC a time-off-task or absence limit due to her pain; no doctor endorsed or opined such a limit and ALJ did not ignore the plaintiff's subjective reports).

14

Nor does Plaintiff explain why her alleged limitations were more severe than those the ALJ assessed. When assessing her RFC, the ALJ considered evidence showing that some of her symptoms improved with medication; the results of diagnostic tests and clinical examinations; the conservative nature of some of her treatment; her activities of daily living; medical opinions; and prior administrative findings. (R. at 23–27.) The ALJ also considered Plaintiff's subjective symptoms but did not fully credit them because, as discussed, the record evidence did not support the severity, intensity, or frequency of the limitations she alleged. (*Id.*) On this record, Plaintiff has not met her burden of demonstrating that the RFC assessed by the ALJ was not supported by substantial evidence. *See Miller v. Comm'r of Soc. Sec. Admin.*, No. 3:20-CV-506, 2021 WL 4745430, at \*3 (S.D. Ohio Oct. 12, 2021), *adopted and aff'd,* 2021 WL 5003452 (S.D. Ohio Oct. 27, 2021) (finding ALJ did not err by failing to include a time-off-task or absence limit in an RFC; ALJ was not require to rely on the plaintiff's subjective complaint about needing such a limit where the ALJ's subjective symptom assessment was explained and supported by the record). Consequently, Plaintiff's second contention of error lacks merit.

## V. RECOMMENDED DISPOSITION

For all the reasons contained herein, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## <u>PROCEDURE ON OBJECTIONS</u>

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a *de novo*

15

determination of those portions of the Report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


**IT IS SO ORDERED.**


/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE